IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____
                                              :
MICHAEL MURPHY,                               :
                                              :        Civil Action No. 08-5697 (PGS)
              Plaintiff,                       :
                                              :
v.                                            :
                                              :        OPINION
COMMISSIONER OF SOCIAL SECURITY,              :
                                              :
              Defendant.                       :
                                              :
_____:

          This matter comes before the Court pursuant to section 405(g) of the Social Security Act as amended, 42 U.S.C. 405(g) ("Act").  Plaintiff Michael Murphy ("Plaintiff" or "Murphy") seeks a review of the final decision of the Commissioner of Social Security Administration denying his claim for disability insurance benefits.  The Court has jurisdiction to review this matter under Section 405(g) of the Act and decides the matter without oral argument.

          Plaintiff filed an application for disability insurance benefits on May 25, 2005 alleging disability beginning March 31, 1996[1] due to back and hip pain and bipolar disorder.  (R. 57, 58). Plaintiff's application was denied on August 16, 2006. Thereafter, Plaintiff requested and was granted a hearing on June 5, 2008 before Administrative Law Judge Richard L. DeSteno (ALJ). The ALJ denied Plaintiff's request for disability insurance benefits in his opinion dated June 26, 2008.

_____

[1]          The date of alleged disability was subsequently changed to December 31, 1999.

## I.

Plaintiff is a 51 year old man born on January 15, 1959 in London, England. Presently, he lives in Bayonne, New Jersey with his ex-wife.  He is  5'11" and weights approximately 211 pounds.[2] He grew up in Ireland before immigrating to the United States in 1980.  He attended school in Ireland until he was 13 years old, but has no other formal education or vocational training.  (R. 64).   Most of his past work experience is as a plasterer in the construction field from 1988 to the date of his alleged disability. (R. 58).  Plaintiff's employment as a plasterer required the use of machines, tools and equipment, and required  some level of skill.  His  job required him to stand and walk for eight hours; and to climb, stoop, kneel, crawl, reach, and manipulate large and small objects during the day.  Additionally, Murphy lifted heavy items such as bags of cement, ladders and tools, the heaviest of which was about 80 pounds. (R. 59).  His most recent employment was from August, 2004 to January, 2005 for AC Plastering Corp.

In addition to his plastering, Plaintiff purchased and ran a pizza and pasta restaurant in Phoenix, Arizona from May 1999 through August 1999.  (R. 409).   Murphy testified that he acquired the pizza business subsequent to major lumbar spine surgery as a way to help his condition and health so that he wouldn't have to plaster again.   Unfortunately, the pizza business was unsuccessful.[3]  Plaintiff has suffered from back pain since approximately 1993.  Plaintiff has pain all day in his lower back (lumbar spine) which he described as aching, burning, cramping, stabbing

---

[2]  The Plaintiff's weight versus his height indicates obesity, but it was not substantially addressed within the ALJ's decision as a determinative factor.

[3]  Plaintiff testified "I haven't a clue how to manage anything" and that his employees were taking advantage and stealing from him. (R. 410).  Currently, Plaintiff does not receive any type of income or food stamps.  (R. 402).

stinging and throbbing. (R. 78). Simple things like walking, sleeping in any position, standing, lifting, kneeling, sitting, squatting and reaching are all painful. The pain is exacerbated by walking up stairs, bending or lying on a soft bed. (R. 78). Plaintiff takes prescription pain relievers for his pain, sometimes up to four times a day (every six hours) depending on the level of pain at the time. These pain relievers include Hydrocodone, Vicaden and Percocet as well as Ambien to address sleeplessness. Plaintiff indicates that his medications cause irritability, moodiness, depression and tiredness. (R. 80, 419).

Beginning in approximately 2000, Plaintiff began having hip pain that radiates down into his legs and increases when walking. The pain is continuous, and lasts the whole day. (R. 81). Lastly, Plaintiff suffers from bipolar disorder for which he seeks psychiatric treatment and takes daily medication.[4]

At the hearing, Plaintiff testified that he wakes in the morning, takes his medications and walks a few blocks. He watches television most of the day. (R. 90, 420). He lacks stamina to do any other activities. According to Plaintiff, he previously socialized and enjoyed life, but no longer does so due to the pain. (R. 115). He has difficulty sleeping, and takes Ambien, a sleeping pill. (R. 91, 422). Plaintiff has pain when bending over to dress and bathe. He does not do any household chores, and needs constant reminders to take care of personal obligations due to forgetfulness. (R. 92). He shops with his ex-wife once a week and travels to Alcoholics Anonymous meetings three times a week. (R. 94). Despite his pain, he traveled abroad on two occasions (Phillipines and Ireland) since 1999. He has anger issues which often upset relationships with family and friends.

---

[4] There is a dispute as to the date of onset of Plaintiff's bipolar disorder. There are facts which suggest a psychiatric disorder from 1997, but the ALJ found none prior to March 31, 2005.

Plaintiff's ex-wife, Remedios Murphy, testified at the hearing on behalf of Plaintiff.  Ms. Murphy allows Plaintiff to stay at her house, feeds him and helps him with his laundry.  She testified that he is constantly complaining about his back; is unable to traverse the stairs without stopping; and sometimes lies on the floor to ease his back pain.  With regard to his psychiatric condition, Ms. Murphy avoids communicating with Plaintiff because of his temperament. His mood is "hot and cold" and he "blows up out of nowhere."  (R. 430).  She testified that Plaintiff prefers to stay alone and he doesn't talk much. (R. 431).

Treating Neurosurgeon and Physician Records with Regard to Back Injury

In 1995, Plaintiff began treating for back pain with George V. DiGiacinto, M.D., Director of the Department of Neurosurgery at St. Luke's-Roosevelt Hospital Center.   Dr. DiGiacinto performed back surgery on Plaintiff and has prescribed medications for Plaintiff's back pain since that time.  More specifically, on July 16, 1996, Dr. DiGiacinto performed a right L4-L5 and L5-S1 interlaminar laminotomy, foraminotomy and excision of a herniated disc, plus left L4-L5 foraminotomy and nerve root decompression.[5]  The diagnosis was degenerating nuclear pulposus at L5-S1 and L4-5 intervertebra discs. (R. 142, 209).  On February 24, 1997, a follow-up MRI found post surgical changes at L4-5 and L5-S1, scar tissue; and broadly bulging annulus at L4-5 with no

_____

[5]     Laminectomy, also called decompression, is surgery to remove the lamina — the back part of the vertebra that covers your spinal canal. Laminectomy enlarges your spinal canal, relieving pressure on the spinal cord or nerves caused by narrowing of the spine (spinal stenosis). Laminectomy may also be performed as part of surgical treatment for a herniated disk.

Laminectomy is not necessary for everyone who has spinal stenosis. Laminectomy usually is used when more conservative treatment, such as medication and physical therapy, has failed to relieve symptoms, or when symptoms are severe.
http://www.mayoclinic.com/health/laminectomy/MY00674

4

focal herniation.

After the surgery, Plaintiff continued to treat with Dr. DiGiacinto. In 1998, Plaintiff had

persistent pain in his back which was "clearly exacerbated by physical activity at work." (R. 354).

In 2001, Dr. DiGiacinto noted that Plaintiff was taking Vicodin three to four times a day for pain.

He had gained 70 pounds which contributed to the pain. Dr. DiGiacinto was "very concerned about

lumbar instability." (R. 360). In 2002, Dr. DiGiacinto noted that Plaintiff continued to do heavy

lifting in his construction job, and was tolerating the pain as long as he continued with Vicodin four

times a day. On February 2, 2005, Plaintiff was seen for acute pain in both legs. He had a limited

range of motion and paraspinous muscle spasm. Dr. DiGiacinto opined that Plaintiff was disabled

secondary to pain in his lumbar spine. (R. 369)[6]. On July 12, 2005, Dr. DiGiacinto found Plaintiff

could only lift a  maximum of five pounds; standing or walking was limited to less than two hours

per day; and sitting was limited to less than six hours a day. Dr. DiGiacinto opined that Plaintiff

suffered from lumbar instability at L4-L5. On October 10, 2007, Plaintiff again treated with Dr.

DiGiacinto for worsening back pain and lumbar instability. At that time the doctor indicated that

Plaintiff would undergo lumbar fusion at L4-L5 and L5-S1 with pedicle rod and screw fixation.[7] He

opined that Plaintiff was disabled for well over a year and that his disability would be permanent.

Plaintiff continued to use Vicodin on a regular basis. (R. 359, 367, 372, 375, 376).

On January 10, 1999, a lumbar spine MRI showed mild degenerative disc disease at L3-L4

through L5-S1 with evidence of the prior discectomy at L4-L5 and scar at that level. There was mild

L4-L5 disc bulge and no significant spinal stenosis. (R. 140-142, 200). All of the post surgery MRIs

---

[6]     On at least three occasions, Dr. DiGiacinto found Murphy was totally disabled.

[7]     It is uncertain if this surgery occurred.

5

had similar impressions. For example, a September 12, 2001 MRI of the lumbar spine found degenerated L3-L4, L4-L5, and L5-S1 discs, peri-thecal scar, and narrowing of foramen bilateral at L3-L4, L4-L5 and L5-S1 levels. (R. 221).   An August 9, 2005 MRI of the lumbar spine similarly concluded postoperative changes with scar formation; no recurrent disc herniation; and that L3-L4, L4-L5 and L5-S1 discs were degenerated and demonstrated posterolateral bulging with narrowing of the corresponding formamina. (R. 290).

Plaintiff was examined by Christine J. Quinto, MD, a neurologist of Hudson Neurosciences, to evaluate his reoccurring back pain.  During an October 2, 2001 examination, Plaintiff's strength was a 5/5 and his gait was normal.  His sensory examination revealed diminished vibration in his distal lower extremities, and a mild lumbar paraspinal spasm.  Dr. Quinto's diagnosis was chronic low back syndrome with possible peripheral neuropathy. (R. 251).

On July 16, 2005, Plaintiff was examined by John Joseph Smith, M.D., an internal medicine specialist, for an evaluation requested by the Division of Disability. (R. 285-288).  Plaintiff treated with Dr. Smith on numerous occasions as his treating physician from 2002 through 2006.[8]   In his March 12, 2006 report, Dr. Smith believed that Plaintiff could benefit somewhat from physical therapy, but did "not  believe he can return to work in his previously assigned work field doing brick and tile work." There was recognition of Murphy's bipolar disorder.  He stated:

> I think also that unfortunately because of his psychiatric make up his urgency and pressured speech and his basic inability to focus on issues and probably lack of trainability at this point and this time will also make reasonably unlikely that he can return to any type of

---

[8]      Dr. Smith has treated Plaintiff for pain, anxiety, bipolar disorder and sleep problems. Prescriptions included Hydocodone for pain, Ambien for sleep problems, Prevacid, and a psychiatric medications including Prozac, Depakote , Clonazepen, Carbamazepine, and Alprazolam.

productive work anytime in the near future." (R. 288).

On January 3, 2005 Plaintiff presented at Therapro, LLC to determine if physical therapy would help in his recovery.  As part of that evaluation, Larisa Tsaur, MD, performed a EMG/NCV study on Plaintiff. The result revealed evidence of acute L5-S1 radiculpathy on the left and neuropraxic S1 radiculpathy on the right.

In addition to back injuries, Plaintiff suffered with hip pain.  In December, 2004, he was examined by Jeffrey F. Augustin, M.D.   Dr. Augustin diagnosed degenerative joint disease of the hips.  Plaintiff was treated with antiinflammatory medications, and counseled against hip replacement due to his young and age and occupation as a laborer.  (R. 283-85).

Treating Psychiatrist Notes with regard to Bipolar Disorder

In addition to his back and hip pain, Plaintiff alleges he suffers from bipolar disorder. A review of the record shows that Plaintiff began treating for a psychiatric condition in 1999 and taking psychiatric prescription medications sometime in 1999 or 2000.   Plaintiffs medications include Alprazolam, also known as Xanax (for anxiety and panic attacks), Carbamazepine (an anticonvulsant and mood stabilizing drug used primarily in the treatment of epilepsy and bipolar disorder), Prozac (to treat major depressive disorder and anxiety), and Trazondone or Lexapro (an antidepressant to treat depression and anxiety disorders).  According to Plaintiff, these medications make him irritable, moody, depressed and tired. (R. 83).

    Plaintiff treated with Jacob Jacoby, M.D. for a psychiatric condition between 1999 and 2004. (R. 238-247). Dr. Jacoby's notes in December 1999 indicate that Plaintiff was treating his anger problems with Prozac.  On June 22, 2000, Plaintiff experienced angry outbursts which may

7

have arisen from the death of his mother two weeks before, and the failure of his business which resulted in a financial loss. (R. 239). Plaintiff was also concerned about the probability of another back surgery. He was maintained on Prozac 40 mg. On March 18, 2002, Dr. Jacoby's notes indicated that Plaintiff had been living in Manhattan and had been treating with a Dr. Perez who treated Plaintiff with Depakote. During that period, Plaintiff had gained 50 pounds on Depakote. Dr. Jacoby changed his medication to Topamax.

From November 6, 2003 through October 1, 2007, Plaintiff treated with Scott Aftel, M.D. for bipolar disorder. (R. 350-370). Dr. Aftel recorded that Plaintiff has been taking prescription medications for bipolar disorder from earlier in 2003. On October 31, 2005, Dr. Aftel opined that Plaintiff's understanding and memory were limited, he had poor concentration, was limited in his ability to interact with the public, and to accept supervisory instructions or interconnect with co-workers due to his irritability and a bad temper. Although there were long gaps between treatment, at the end, Dr. Aftel diagnosed Plaintiff with a poor prognosis and that Plaintiff was unable to function. (R. 393). In the years 2006, 2007, and 2008 Dr. Aftel treated Plaintiff for bipolar disorder, mixed type, which in Dr. Aftel's opinion rendered him disabled. His medications were Lexapro and Xanax four times a day with Trazodone at bedtime to treat the disorder. (R. 393-396, 399).

Lastly, Plaintiff also suffers from relatively minor gastrointestinal symptoms. In July, 1999, Dr. Prakash diagnosed Plaintiff with grade 1 esophagitis, hypertrophic gastritis and duodenitis. In May, 2001, Plaintiff was admitted to Bayonne Hospital with chest pain, difficulty breathing, and gastrointestinal symptoms. He was diagnosed with peptic ulcer disease as well as depression and obesity. (R. 204, 205, 216).

<u>Residual Functional Capacity</u>

The Residual Functional Capacity ("RFC") Assessment found that Plaintiff could occasionally lift and/or carry less than 10 pounds, frequently lift and/or carry less than 10 pounds, stand and/or walk (with normal breaks), sit (with normal breaks), and must periodically alternate sitting and standing to relieve pain every half hour. Plaintiff's RFC was found to be unlimited in his ability to push/pull, with no postural limitations established (i.e. he can climb, balance, stoop, kneel, crouch and crawl). There were no manipulative, visual, communicative or environmental limitations. (R. 292-299).   The Psychiatric Review Technique found "insufficient evidence" to evaluate Plaintiff's bipolar disorder. (R. 300-306).[9]

II.

<u>Legal Standard for Disability</u>

A claimant is considered disabled under the Social Security Act if he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which … has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  A plaintiff will not be considered disabled unless he cannot perform his previous work and is unable, in light of his age, education, and work experience, to engage in any other form of substantial gainful activity existing in the national economy.  42 U.S.C. §423(d)(2)(A);  *see Sykes v. Apfel*, 228 F.3d. 259, 262 (3d Cir. 2000); *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 118 (3d Cir. 2000); *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999).  The Act requires an individualized determination of each plaintiff's disability based on

---

[9]     It is uncertain whether this review included records of treatment; or was found "insufficient" because nothing was provided.

evidence adduced at a hearing.  *Sykes*, 228 F.3d at 262 (citing *Heckler v. Campbell*, 461 U.S. 458, 467 (1983)); *see* 42 U.S.C. §405(b).  The Act also grants authority to the Social Security Administration to enact regulations implementing these provisions.  *See Heckler*, 461 U.S. at 466; *Sykes*, 228 F. 3d at 262.

The Social Security Administration has developed a five-step sequential process for evaluating the legitimacy of a plaintiff's disability.  20 C.F.R. § 404.1520.  First, the plaintiff must establish that he is not currently engaging in substantial gainful activity.  20 C.F.R. § 404.1520(a).  If the plaintiff is engaged in substantial gainful activity, the claim for disability benefits will be denied.  See *Plummer*, 186 F.3d at 428 (citing *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987)).  In step two, if the plaintiff is not working, he must establish that he suffers from a severe impairment.  20 C.F.R.  § 404.1520(c).  If plaintiff fails to demonstrate a severe impairment, disability must be denied.

If the plaintiff suffers a severe impairment, step three requires the ALJ to determine, based on the medical evidence, whether the impairment matches or is equivalent to a listed impairment found in "Listing of Impairments" located in 20 C.F.R.  § 404, Subpart P, Appendix 1.  *Id.*; *Burnett*, 220 F.3d at 118-20.  If it does, the plaintiff is automatically disabled.  20 C.F.R. §404.1520(d).  But, the plaintiff will not be found disabled simply because he is unable to perform his previous work.  *Id.*  In determining whether the plaintiff's impairments meet or equal any of the listed impairments, an ALJ must identify relevant listed impairments, discuss the evidence, and explain his reasoning.  *Burnett*, 220 F.3d at 119-20.  A conclusory statement of this step of the analysis is inadequate and is "beyond meaningful judicial review."  *Id.* at 119.

If the plaintiff does not suffer from a listed severe impairment or an equivalent, the ALJ proceeds to steps four and five. *Plummer*, 186 F. 3d at 428. In step four, the ALJ must consider whether the plaintiff "retains the residual functional capacity to perform [his or] her past relevant work." *Id.*; *see Sykes*, 228 F.3d at 263; 20 C.F.R. § 404.1520(d). This step requires the ALJ to do three things: 1) assert specific findings of fact with regard to the plaintiff's residual functional capacity ("RFC"); 2) make findings with regard to the physical and mental demands of the plaintiff's past relevant work; and 3) compare the RFC to the past relevant work, and based on that comparison, determine whether the claimant is capable of performing the past relevant work. *Burnett*, 220 F.3d at 120.

If the plaintiff cannot perform the past work, the analysis proceeds to step five. In this final step, the burden of production shifts to the Commissioner to determine whether there is any other work in the national economy that the plaintiff can perform. See 20 C.F.R. § 404.1520(g); If the Commissioner cannot satisfy this burden, the claimant shall receive social security benefits. *See Yuckert*, 482 U.S. at 146 n.5; *Burnett*, 220 F.3d at 118-19; *Plummer*, 186 F.3d at 429; *Doak v. Heckler,* 790 F.2d 26, 28 (3d Cir. 1986). In demonstrating there is existing employment in the national economy that the plaintiff can perform, the ALJ can utilize the medical-vocational guidelines (the "grids") from Appendix 2 of the regulations, which consider age, physical ability, education and work experience. 20 C.F.R. §404, subpt. P, app.2. However, when determining the availability of jobs for plaintiffs with exertional and non-exertional impairments, "the government cannot satisfy its burden under the Act by reference to the grids alone," because the grids only identify "unskilled jobs in the national economy for claimants with exertional impairments who fit the criteria of the rule at the various functional levels." *Sykes*, 228 F.3d at 269-70. Instead, the

Commissioner must utilize testimony of a "vocational expert or other similar evidence, such as a learned treatise," to establish whether the plaintiff's non-exertional limitations diminish his residual functional capacity and ability to perform any job in the nation. *Id.* at 270-71, 273-74; *see also Burnett,* 220 F.3d at 126 ("A step five analysis can be quite fact specific, involving more than simply applying the Grids, including… testimony of a vocational expert"). If this evidence establishes that there is work that the plaintiff can perform, then he is not disabled. 20 C.F.R. § 404.1520(g).

Review of ALJ by District Court

Review of the Commissioner's final decision is limited to determining whether the findings and decision are supported by substantial evidence in the record. *See Morales v. Apfel*, 225 F.3d 310, 316 (3d Cir. 2000); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999); *see also* 42 U.S.C. § 405(g). The Court is bound by the ALJ's findings of fact if they are supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g)*; Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.*" Hartranft,* 181 F.3d at 360 (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation omitted)); *see Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla. *Richardson*, 402 U.S. at 401; *Morales*, 225 F.3d at 316; *Plummer*, 186 F.3d at 422. Likewise, the ALJ's decision is not supported by substantial evidence where there is "competent evidence" to support the alternative and the ALJ does not "explicitly explain all the evidence" or "adequately explain his reasons for rejecting or discrediting competent evidence." *Sykes*, 228 F.3d at 266 n.9

The reviewing court must view the evidence in its totality. *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984).

> A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence - - particularly certain types of evidence (e.g., that offered by treating physicians) - - or if it really constitutes not evidence but mere conclusion.

*Morales*, 225 F.3d at 316 (citing *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir.1983));  *See Benton v. Bowen*, 820 F.2d 85, 88 (3d Cir. 1987).  Nevertheless, the district court's review is deferential to the ALJ's factual determinations. *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992) (en banc) (stating that the district court is not "empowered to weigh the evidence or substitute its conclusions for those of the factfinder.").  A reviewing court will not set a Commissioner's decision aside even if it "would have decided the factual inquiry differently."  *Hartranft*, 181 F.3d at 360.  But despite the deference due the Commissioner, "appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence."  *Morales*, 225 F.3d at 316 (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)).

Title II of the Social Security Act (42 U.S.C. § 401, *et seq.* requires that the claimant provide objective medical evidence to substantiate and prove his or her claim of disability.  *See* 20 CFR § 404.1529.  Therefore, claimant must prove that his or her impairment is medically determinable and cannot be deemed disabled merely by subjective complaints such as pain.  A claimant's symptoms "such as pain, fatigue, shortness of breath, weakness, or nervousness, will not be found to affect . . . .[one's] ability to do basic work activities unless "medical signs" or laboratory findings show that a medically determinable impairment(s) is present."  20 C.F.R.  §404.1529(b).  *Hartranft* , 181 F.3d at 362. In *Hartranft*, claimant's argument that the ALJ failed to consider his subjective findings were rejected where the ALJ made findings that claimant's claims of pain and other subjective symptoms

13

were not consistent with the objective medical records found in the record or the claimant's own hearing testimony. As a result of the standards, the ALJ failed to utilize a vocational expert at Step 5 as required, and has failed to adequately address the competent evidence presented which is contrary to the ALJ's finding.

III.

In this case, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  In reviewing the ALJ's decision, it is important to determine whether the decision meets the five step sequential analysis.  Without delving into each of the steps, steps four and five are of importance.  ALJ DeStephano found claimant could not perform any past relevant work (plastering); but could perform sedentary work in accordance with the Medical-Vocational Rules.

In finding Plaintiff cannot perform past relevant work, the ALJ must analyze step five.  In demonstrating there is existing employment in the national economy that the plaintiff can perform, the ALJ may utilize the medical-vocational guidelines (the "grids") from Appendix 2 of the regulations, which consider age, physical ability, education and work experience.  20 C.F.R. §404, Subpt.P, App.2.  However, when determining the availability of jobs for plaintiffs with exertional and non-exertional impairments, "the government cannot satisfy its burden under the Act by reference to the grids alone," because the grids only identify "unskilled jobs in the national economy for claimants with exertional impairments who fit the criteria of the rule at the various functional levels."  *Sykes*, 228 F.3d at 269-70.  Instead, the Commissioner must utilize testimony of a "vocational expert or other similar evidence, such as a learned treatise," to establish whether the

14

plaintiff's non-exertional limitations diminish his residual functional capacity and ability to perform any job in the nation.  *Id.* at 270-71, 273-74; see also *Burnett,* 220 F.3d at 126.   If this evidence establishes that there is work that the plaintiff can perform, then he is not disabled.  20 C.F.R.  § 404.1520(f).

Plaintiff's Non-Exertional Impairments

The record shows that Plaintiff was treated by Dr. Aftel and Dr. Jacoby for bipolar disorder. Although the ALJ found the bipolar disorder did not arise until after the date last insured for disability insurance benefits (May 31, 2005), this finding is inconsistent with the evidence.  For example,  Dr. Aftel states he diagnosed bipolar disorder as far back as April, 2003.  In a report to Ms. Saldana, Dr. Aftel reported:

> I am writing this update in regard to my patient Mr. Michael Murphy who was first seen by me on April 6, 2003. His most recent visit was May 10, 2006. His current diagnosis is bipolar disorder mixed type, 295.63. At the present time Mr. Murphy seems to be slightly on the depressed side, however, during his course of psychotherapy and medication he appears to have stabilized. His current medications are Lexapro 20 mgs daily, Xanax 0.5 mgs. four times a day and Trazodone 50 mgs at bedtime. Mr. Murphy has been compliant with his treatment as well as his medications.

 (R. 393).

Similarly in another letter dated May 29, 2008, Dr. Aftel again reported bipolar disorder from 2003.

He wrote:

> I am writing this in regards to Mr. Murphy who has been under my care since November, 2003. Mr. Murphy suffers from bipolar disorder mixed type which has rendered him disabled. Mr. Murphy has been under continuous treatment including the period of March 2005 until present day. He is currently taking psychotropic medication. Mr. Murphy has been compliant with his treatment as well as follow up.

(R. 399)

Moreover, in another report there is evidence of bipolar disorder prior to March 31, 2005. In a report of Dr. Augustin dated December 8, 2004, it noted that the "past medical history is significant for bipolar." (R. 283). Although Dr. Augustin was retained to treat hip pain, it was obvious at that time that the bipolar diagnosis was considered in Plaintiff's treatment.

Similar to Dr. Aftel, Dr. Jacoby provided early evidence of a psychiatric disorder. On March 18, 2002, Dr. Jacoby examined Plaintiff. He placed Plaintiff on Prozac and supportive therapy which coincides with his bipolar disorder. (R. 238). In addition, Dr. Jacoby commented that Plaintiff had previously treated with Dr. Perez in Manhattan who prescribed Depakote, a medication used for bipolar disorder.

For social security disability purposes, severe mental impairments are non-exertional limitations. *See* 20 C.F.R. § 404.1569a(a), (c). There is substantial evidence in the record that ongoing psychiatric treatment occurred prior to the March 31, 2005, and a vocational expert should have been retained to determine the impact of both the exertional and non-exertional factors in Plaintiff's ability to work. Step five must be revised because reliance on the Grids is insufficient.

Moreover, under the regulations, the Commissioner is required to consider the "type, dosage, effectiveness, and side effects of any medication[s] a claimant has taken to alleviate pain or other symptoms." 20 C.F.R. § 404.1529(c)(3)(iv). Among the drugs Plaintiff takes on a daily basis are Aprazolam for anxiety, Vicodin (hydrocodone) for pain, Lexapro for bipolar disorder and Ambien as a sleep aide. These drugs have significant side effects. For example, the less severe side effects of Aprazolam include drowsiness, dizziness, feeling irritable, amnesia or forgetfulness, trouble concentrating and sleep problems. Common side effects of hydrocodone include anxiety,

constipation, diarrhea, dizziness, dry mouth, gas, headache, heartburn, increased sweating, loss of appetite, nausea, nervousness, stomach pain or upset, trouble sleeping, vomiting, and weakness. Side effects of Lexapro include headache and extreme tiredness.  Ambien can cause side effects that could impair thinking or reaction time, and cause grogginess in the morning after taking the medication.  In short,  it must be known whether Plaintiff's non-exertional psychiatric disorder and side effects of medications in combination with his severe back condition render Plaintiff disabled. 20 C.F.R.  § 404.1523.   Only a vocational expert can competently evaluate those factors together. *Sykes v. Apfel*, 228 F.3d 259 (3d Cir. 2000).

IV.

In several places throughout the ALJ's decision, the ALJ noted that a finding of disability is reserved for the Commissioner, and that doctors are not authorized to do same.  Although this proposition may be correct, when evaluating medical opinions, the regulations direct that the Commissioner consider all of the following factors in deciding the weight to give to any medical opinion.  Generally, more weight is given to the opinion of a source who has examined a claimant rather than a non-examining source.  Additionally, the treatment relationship is considered and more weight is given to opinions from treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of a medical impairment and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone.  20 C.F.R. § 1527.

It is very difficult to understand how the ALJ bypassed the opinions of two of Plaintiff's treating physicians, Dr. Smith and Dr. DiGiacinto, who found Mr. Murphy disabled.

Dr. DiGiacinto, Plaintiff's spine surgeon, found him severely disabled due to his lower back complications. On February 28, 1997, Dr. DiGiacinto reported to Social Security Disability as follows:

> Postoperatively, Mr. Murphy has noticed a change in his pain syndrome, but still has marked limitation in his ability to ambulate and ability to sit for more than a few minutes at a time; he cannot tolerate any kind of lifting or bending and is not even capable of doing laundry or taking the trash out at home.

> Examination reveals persistent paraspinous muscle spasms in the lumbar spine, limited range of motion in his back with flexion to 15 degrees, extension to 10 degrees and lateral flexion to 10 degrees in either direction. Rotation is limited to approximately 5 degrees bilaterally. Straight leg raising is positive bilaterally at 30 degrees. He exhibits decreased pin sensation in the L5 and S1 dermatome. There is minimal (-5/5) strength in gastric and anterior tibialis muscular on the right.

> At this time, I consider Mr. Murphy to be totally disabled from any type of employment. Certainly there is no possibility that he will ever be able to return to the heavy lifting that he was doing in his previous work in construction.

> At this time, however, he is not able to sit for any period of time without great discomfort, and is not able to do any kind of minimal lifting at all. Therefore, I do classify him as totally disabled.

Thereafter, in February 2005, Dr. DiGiacinto noted again that Plaintiff "is totally disabled secondary to pain relating to his lumbar spine." He wrote:

> Mr. Murphy comes back with significant recrudescence of pain in both legs, right and left. he has been working as a plasterer, which is, of course, very heavy work and this has really exacerbated his back pain as well as his leg pain.  (R. 369)

> On examination, he has limited range of motion. He has paraspinous muscle spasm.

> I have previously been concerned about lumbar instability. I, therefore, am sending him for flexion-extension films of the lumbar

18

spine as well as new MRI scan. The patient, at this time, is totally disabled secondary to pain relating to his lumbar spine.

On October 10, 1997,  Dr. DiGiacinto describes Plaintiff's disability as "permanent" in a letter to the New Jersey Division of Disability Services.  He opined:

> Michael Murphy has been a patient of mine since 1996. He underwent lumbar discectomies at L4-L5 and LS-S1. For a prolonged period of time, he has developed worsening low back pain, and he has been totally disabled for greater than one year. He suffers from lumbar instability.
>
> On examination, the patient exhibits marked paraspinous muscle spasm. Flexion to 40 degrees and extension to 10 degrees cause pain. Motor testing reveals attenuated dorsi and plantar flexion.
>
> Mr. Murphy will undergo a lumbar fusion at L4-L5 and L5-S1 in early 2008 with pedicle rod and screw fixation.
>
> <u>Mr. Murphy is totally disabled and has been for well over one year. His disability will be permanent</u>.

 (emphasis added). (R. 372).

Beyond Dr. DiGiancinto, another physician found Plaintiff disabled.  Dr. Smith of the New Jersey Division of Disability and a prior treating physician found Mr. Murphy to be disabled.  In Dr. Smith's report dated March 12, 2006, he found disability. He wrote:

> At this point, I do not think an independent medical examination on Mr. Murphy would be inappropriate or wrong but from my perspective from the point of the view that we have examined him and his past level of function and his continued decline and certainly losing some weight would go a long way towards possibly helping remediate some of his symptoms but I do believe there is really pathology present at this time and I do not think it is reasonable to think that Mr. Murphy could return to the previous work which he has been trained to do and because of his lack of formal training in other areas at this point in his life, I doubt that it is reasonable to think that he is retrainable somewhere else. At this point, although I agree that independent medical evaluation would be appropriate and might even

> be necessary, I support his application for disability at this time and I do not believe that it is reasonable to think that he can return to his former employment and perform at the level necessary to be productive since he is self employed.

(R. 310).

The above opinion re-emphasized Dr. Smith's earlier opinion dated July 16, 2005 where he indicated that Plaintiff's psychiatric and physical conditions rendered Murphy disabled.   Dr. Smith stated:

> I do not believe based on what I know of the patient, his temperament, his demeanor, his psychological and psychiatric makeup as well as his physical limitations and debilities, I do not believe he can return to work in his previously unassigned work field doing brick and tile work.   I believe that it is physically too demanding and challenging and certainly would impact and impair his health and impact in a negative way. I think that unfortunately, because of his psychiatric make up his urgency and pressured speech and his basic inability to focus on issues and probably lack of trainability at this point and this time will also make reasonably unlikely that he can return to any type of productive work anytime in the near future[10].

(R. 287-88)

After reading the entire record and the ALJ's decision, there is competent evidence of Doctors Smith and DiGiacinto to support a different conclusion than reached by the ALJ.  As such, the ALJ did not "adequately explain his reasons for rejecting or discrediting [this] competent evidence." *Sykes*, 228 F. 3d at 266 n.6.  All reasons set forth by the ALJ are "overwhelmed" by reports of the treating physicians. The ALJ "failed to resolve a conflict created by counterveiling evidence." *See Morales*, 225 F. 3d at 316;  20 C.F.R.  §  404.1527(d)(2).

---

[10]    This assessment of psychiatric and physical limitations is very pertinent to the need for testimony of a vocational expert.

Hence, the decision does not meet the substantial evidence test.[11]

V.

In conclusion, the matter is remanded to the Administrative Law Judge for further findings of fact in light of the competent evidence of the treating physicians.  In light of Plaintiff's non-exertional limitations, on remand the ALJ may only use the grids as a framework to guide the disability determination. Instead, the ALJ must seek the advice of a vocational expert, or other similar evidence as outlined in *Sykes*.  *See Sykes*, 228 F.3d at 273.


*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.

March 11, 2010

---

[11]    The ALJ gives little weight to the complaints of Plaintiff about pain because of a lack of his credibility. Although credibility is an issue for the ALJ to determine, the record shows ample support for Plaintiff's pain in relationship to the disorders found.